**In the Matter of PENN CENTRAL TRANSPORTATION COMPANY, Debtor.**

**In re CONVEYANCE of LAND to the CITY of BOSTON.**

**No. 70–347.**

United States District Court, E. D. Pennsylvania.

March 11, 1971.

As Amended March 26, 1971.

See also D.C., 325 F.Supp. 302.

Marvin Comisky, Blank, Rome, Klaus & Comisky, Philadelphia, Pa., for trustees.

Joseph Auerbach, Sullivan & Worcester, Boston, Mass., for New Haven trustee.

John N. Schaeffer, Jr., Morgan, Lewis & Bockius, Philadelphia, Pa., for Fidelity Bank.

OPINION AND ORDER RE: CONVEYANCE OF LAND TO THE CITY OF BOSTON

FULLAM, District Judge.

The Trustees seek permission to convey to the City of Boston, free and clear

of all liens and encumbrances, a strip of land and certain easements, in exchange for a release from certain contractual obligations. A hearing was held on March 8, 1971, at which all concerned agreed that the proposed conveyance would be in the best interests of the Debtor's estate and should be approved. In dispute, however, is the issue of whether or not the Trustees should be required to substitute cash or other securities in lieu of the premises conveyed, to prevent diminution in the value of the lien of the Divisional First Mortgage, now held by the Trustee of the New York, New Haven & Hartford Railroad ("New Haven Railroad").

The factual background is somewhat complicated. Prior to 1897, Summer Street in the City of Boston crossed the tracks of the New Haven Railroad at grade. In that year, Summer Street was elevated and a four-span bridge was erected above the tracks; three of the four spans traversed railroad property, and the railroad granted a perpetual easement of passage by means of the bridge above its tracks.

On May 4, 1968, three of the four spans of this bridge were severely damaged by fire. The damaged portions were removed, at a net cost to the New Haven Railroad of $85,970, and negotiations were commenced with a view toward replacement of the damaged spans. Under applicable Massachusetts law,[1] if the work required constituted a "repair", the railroad would have been liable for 70% of the cost; if it were deemed an "alteration", the railroad would have been liable for about 39% of the cost. The Massachusetts Department of Public Utilities determined that the work was a "repair." This decision was appealed to the Supreme Judicial Court of Massachusetts, but while the appeal was pending a settlement was achieved, under the terms of which the City of Boston agreed to bear 50% of the estimated cost of the bridge construction, and the New Haven Railroad agreed to pay the remainder.

Meanwhile, as of December 31, 1968, the assets and certain liabilities of the New Haven Railroad were acquired by the Penn Central Transportation Company (then known as Penn Central Company), as a condition of the merger of the Pennsylvania and New York Central railroads. The precise status of the Summer Street bridge obligation as between the New Haven Railroad and the Penn Central Transportation Company was in dispute, as were various other substantial matters arising out of the Southern railroads division litigation, and the ownership of certain insurance proceeds aggregating some $750,000, of which approximately $148,000 was attributable to the damage to the Summer bridge.[2]

Ultimately, all of these matters were settled, with the approval of the New Haven Railroad Reorganization Court (Order No. 588, dated August 11, 1969). Under the terms of the settlement, Penn Central assumed certain substantial obligations in connection with the rate litigation, assumed the obligations of the New Haven with respect to the Summer Street bridge project, and received the insurance proceeds mentioned above.

Bids for the reconstruction of the bridge were opened on May 8, 1970. The low bid was $1,050,000. A formal contract was entered into with the City of Boston, under which the City's obligation was limited to one-half the contract price, viz. $525,000.

Shortly thereafter, on June 21, 1970, Penn Central Transportation Company went into reorganization under § 77 of the Bankruptcy Act, and the proposed construction contract did not become a reality. In the meantime, construction costs have risen, so that the Debtor's obligations under its agreement with the City of Boston, if carried out, would require expenditures in excess of $550,000.

---

1. General Laws of Massachusetts, Chapter 159, §§ 84, 59.

2. See affidavit of George A. Royce.

In order to resolve this impasse, the City of Boston has offered to release the Debtor from all obligations in connection with the construction of the replacement Summer Street bridge, in exchange for the conveyance of the fee title to the 100-foot strip of land directly beneath the old bridge (i. e., directly beneath the bed of Summer Street), together with slope easements and related easements over three small adjoining pieces of property. Instead of rebuilding the missing spans of the bridge, the City of Boston would then fill in the area and build a road at the level of the existing span. This would require the removal or relocation of certain tracks, water and gas lines, and other facilities, at a cost to the Debtor of approximately $85,800. The operation of the railroad would not be adversely affected, as there would be adequate rail access to nearby yards and other facilities via tracks beneath the existing bridge span.

On the basis of the foregoing facts, all of which are undisputed, it is clear that the proposed conveyance would be in the best interests of the Debtor's estate and should be approved. Accordingly, Order No. 179 has been entered, authorizing the conveyance, but reserving jurisdiction to determine the rights of the lien-claimants.

As of December 31, 1968, the Debtor executed and delivered the Divisional First Mortgage, as a first lien on the assets then acquired from the New Haven,[3] in partial payment of the consideration for such acquisition. The indenture trustees under that mortgage, and the bondholders (the Trustee of the New Haven Railroad) have filed answers opposing the proposed conveyance or, in the alternative, requesting that approval of the conveyance be conditioned upon furnishing substitute security equal in value to the property conveyed. At the hearing, their opposition was limited to the alternative request.

A somewhat analogous situation arose in connection with the reorganization of the Central Railroad of New Jersey. There, proceeds from sales of various parcels of real estate subject to mortgage had been deposited in a special account, also subject to the lien of the mortgage, in substitution for the real estate. The Reorganization Court permitted the Trustee to withdraw $408,000 from this account to pay for demolition and removal of a damaged drawbridge. In Central Railroad Company of New Jersey v. Manufacturers Hanover Trust Co., 421 F.2d 604 (3rd Cir. 1970), the Court of Appeals held that since the demolition project did not add to the operational plant or increase the value of the mortgaged property, the use of liened funds for that purpose should not have been permitted, unless upon condition that equivalent value be substituted for the funds withdrawn.

The cited case differed from the present problem in several respects. There, the bridge was across navigable waters, and when it was removed, the railroad retained nothing of value. Moreover, the bondholders' lien had originally included the undamaged span. And finally, the adjacent span was not improved by the expenditure for demolition of the damaged span, but merely protected from possible further damage. In the present case, the lien attached only to whatever was left after the damaged spans had been removed; and the proposed road construction may result in some increase in the value of the adjacent railroad property, because of easier highway access.

■ Nevertheless, the cited case clearly stands for the proposition that, at least in the absence of compelling need (not shown to have existed in the cited case, and not claimed to exist here), liened assets may not be utilized to defray operational expenses, except where substitute security of equivalent value is provided. Lien value must be preserved. It is therefore necessary to determine the net effect of the proposed convey-

---

3. Certain Harlem Division assets are also subject to a prior lien.

ance upon the value of the mortgage security.

The bondholders presented the opinion testimony of a real estate expert, Mr. Mason, that the fair market value of the interests to be conveyed is $295,000. He valued Parcel No. 1, the 100-foot strip directly beneath the (former) bridge, at $3.80 per square foot, or $186,610. He valued the slope easements and construction and maintenance easements, Parcels 2, 3, 4, and 5, at the rate of $2 per square foot, for a total of $108,038. These totals were rounded off to the aggregate sum of $295,000. The Debtor's evidence, via the affidavit of Mr. Gasparini and other supporting affidavits, was to the effect that the property has only "negative value." In my opinion, neither approach is entirely persuasive.

Mr. Mason's appraisal is flawed by his failure to take into account the cost of removal and relocation of existing facilities, which would be necessary in order to make the property saleable at all. Thus, his figure is at least $85,800 too high. Moreover, his basic square foot prices seem somewhat inflated, when compared with the allegedly comparable properties he referred to, all of which were in more favorable locations. More importantly, I feel that he failed to give adequate weight to the pre-existing perpetual easement which authorized the City of Boston to maintain the Summer Street bridge for public travel. To me, it is inconceivable that a purchaser could be found who would be willing to pay $186,610 for the 100-foot strip of land under the bridge, subject to this easement.

I found Mr. Gasparini's prices per square foot more realistic; however, it is clear from his affidavit that the "negative value" was arrived at by taking into account the obligation of the Debtor to pay one-half of the cost of reconstructing the bridge. For the reasons discussed above, that obligation does not affect the lien value.

■ Mr. Gasparini valued the 100-foot strip beneath Summer Street at $.60 per square foot, or $29,464. He valued the slope easements and other easements conveyed in Parcels 2, 3, 4, and 5 at $1.50 per square foot, or $82,500. Thus, according to Mr. Gasparini's appraisal, the market value of the interests to be conveyed is $111,964. I accept this figure as substantially accurate.[4] Subtracting from that figure the $85,800 which must be expended in order to make the property saleable produces a net value of $26,164. In my opinion, substitution of security in that sum is required in order to protect the interests of the lien holders.

■ I have concluded that the full cost of $85,800 is properly deductible from the gross market value for purposes of the issues now before the Court. While the actual cost to "strip" the land in order to make it theoretically saleable may be less than the sum mentioned, it seems reasonable to suppose that whatever "relocation" costs are included in the $85,800 figure would, to a large extent, represent "betterments" of the facilities retained by the Debtor. And even if these expenditures are properly chargeable to operations, the full sum should be taken into account in determining the effect of this transaction on lien value; the lien creditors are not entitled to have operational funds used in order to create or enhance market value of liened property.

For present purposes, I believe the factor of insurance need not be considered. The objectors apparently make no contention in that regard. In any event, the factor of insurance should not affect the result reached. In its overall settlement with the New Haven, the Debtor did receive proceeds from several insurance claims, of which $148,201 appears to have been allocable to the Summer

4. No allowance has been made for possible increase in value of the adjacent property retained by the Debtor, since the evidence presented did not explore this possibility.

Street bridge damage. Presumably, $85,970 of this amount was used in reimbursing the New Haven for the amount expended in removing the debris, leaving a balance of $62,231. It does not appear that the lien of the Divisional First Mortgage ever attached to these proceeds, or that anyone ever claimed that it should. No attempt was made in the 1969 settlement to restrict or segregate these proceeds. Needless to say, they are not now available to the reorganization Trustees.

For the reasons discussed above, an order will be entered requiring the reorganization Trustees to furnish substitute security in the sum of $26,164. This can take the form of a deposit in cash in that amount, pursuant to Order No. 78. However, if a cash deposit is not feasible, the Court will, upon application and cause shown, consider alternative methods of providing such security, in accordance with the principles enunciated in Central Railroad Company of New Jersey v. Manufacturers Hanover Trust Company, *supra*.